**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN PAUL GOMEZ, | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 07-00868 |
| | ) | Judge Nora Barry Fischer |
| OFFICER JAMES MARKLEY | ) | |
| AND MIDWAY BOROUGH POLICE | ) | |
| DEPARTMENT, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

## I. INTRODUCTION

Plaintiff John Paul Gomez (hereinafter "Gomez") filed this civil action *pro se* against Defendants Officer James Markley (hereinafter "Markley") and the Midway Borough Police Department (hereinafter "Midway"), alleging a violation of his Fourth Amendment rights pursuant to 42 U.S.C. § 1983, as well as state law claims for defamation, invasion of privacy (false light), and intentional infliction of emotional distress. Currently pending before the Court are cross motions for summary judgment: Defendants' Motion to Dismiss in the form of a Motion for Summary Judgment [22] and Plaintiff's Motion for Summary Judgment [42]. Based on the following, Defendants' Motion is GRANTED and Plaintiff's Motion is DENIED.

## II. FACTUAL BACKGROUND

Although the motions and briefing along with accompanying affidavits are fact intensive, the Court distills the following key facts from the record before it. On March 26, 2007, Markley, then a Midway Borough Police Officer, was patrolling Midway Borough in a Borough police car when he came upon Gomez's car which bore no inspection stickers. (Docket No. 23 at ¶ 1; Docket No.

27 at ¶ 1).  Markley activated his vehicle's lights and sirens to initiate a traffic stop.  (Docket No. 23 at ¶ 2; Docket No. 27 at ¶ 2).  Gomez cooperated and pulled his car to the side of the road.  (Docket No. 23 at ¶ 3; Docket No. 27 at ¶ 3).

Markley asserts that upon approaching Gomez's car, he observed Gomez acting strangely and exhibiting indications of extreme nervousness. (Docket No. 23 at ¶ 4).  Gomez states that Markley approached his car, stated that his car was not inspected, and requested his driver's license, registration and insurance.  *Id.*  Gomez maintains that he provided the requested information and, therefore, in his opinion, he had no reason to act strange or nervous.  *Id.*  After Markley approached Gomez's car, he also states he observed that Gomez's eyes were bloodshot. (Docket No. 23 at ¶ 5).

Markley inquired where Gomez was from; to which Gomez responded that he was from South Africa.  (Docket No. 23 at ¶ 6).  Markley then asked Gomez where he lived, and Gomez answered that he lived in Midway.  *Id.* at ¶ 7.  Markley next asked Gomez to provide his driver's license.  *Id*. at ¶ 8. Gomez produced his driver's license which identified Philadelphia, Pennsylvania, as his place of residence.  *Id.* at ¶ 9.  At that time, Markley reviewed the issue date on the license and inquired how long Gomez had lived in Midway.  *Id*. at ¶ 10.   Gomez responded that he became a resident of Midway after his license was issued; hence, the license reflected his legal residence at the time it was issued, namely Philadelphia, Pennsylvania.  *Id*. at ¶ 10.  In light of the difference in legal residences between Gomez's statement and his license, as well as his nervous behavior, Markley inquired as to whether Gomez's license was suspended or if there was something illegal in his vehicle.  *Id*. at ¶ 11.  Gomez responded no to both inquiries.  *Id.*  Markley  further questioned Gomez as to his nervousness, to which Gomez responded that there was no reason for him to be nervous.  *Id.*  at ¶ 12.

2

Gomez disputes these facts. He contends that when Markley asked him where he was from, he stated Gambia, West Africa. (Docket No. 27 at ¶ 6). Contrary to what Markley alleges, Gomez maintains that his driver's license identified Philadelphia as his prior residence, and that he provided Markley with a paper copy of his driver's license, which reflected a change of address to Moon Township, Pa. *Id.* at ¶ 9.

Markley next states that he walked back to his police car and ran Gomez's license to determine whether he had any outstanding warrants, as well as to establish the status of his driving privileges. (Docket No. 23 at ¶ 13; Docket No. 27 at ¶ 13). Upon running Gomez's driver's license, Markley was informed that Gomez's driving privileges were suspended[1] (which Gomez disputes[2]) (Docket No. 27 at ¶ 14), and that the vehicle he was driving had an expired registration. *Id.* After securing this information, Markley maintains that he walked back to Gomez's car and asked him to step out. *Id.* at ¶ 15. Gomez adds that Markley asked him to exit his car in an abrupt manner and to place his hands on the top of it. (Docket No. 27 at ¶ 11; Docket No. 27-2 at ¶ 27). Gomez also states that Markley asked him if he had anything on him or in his vehicle that he might voluntarily want to disclose before he commenced a search of his car. (Docket No. 27 at ¶ 12). Markley

---

[1]

*See* Affidavit of Officer Markley, *Response from PA Bureau of Motor Vehicles and Certified Driving History* attached as Exhibit "A." Exhibit "A" indicates that Plaintiff's license was suspended at the time of the incident. (Docket No. 23-2 at pg. 5 of 19).

[2]

*See* Defendant's Exhibit "A" (Docket No. 23-2 at pg. 5 of 6) of Gomez's Certified Driving history signed by the Secretary of Transportation. This document indicates that Gomez's driver's license was suspended effective on October 31, 2005, but that his operating privileges were restored on May 2, 2006. Gomez contends that he went to the Department of Motor Vehicles ("DMV") on March 31, 2007 to inquire as to why his driver's license was suspended. (Docket No. 27-2 at ¶ 100). At the DMV, Gomez states he was advised that his driver's license was not suspended and he paid $10.00 for a duplicate copy of his license. *Id.* at ¶ 101.

contends that Gomez complied with his requests. Accordingly, he began to pat Gomez down for weapons. Markley found no weapons. *Id.* at ¶ 16. After the search, Markley asked Gomez to get back in his car, and he proceeded back to his police patrol car. (Docket No. 27-2 at ¶ 35).

Gomez also avers that Markley then ordered him to stand about three (3) feet away from his car, and Markley walked around the car to the front passenger's side door, opened the door and thoroughly searched his glove compartment and removed two bottles of Visine. (Docket No. 27 at ¶ 25; Docket No. 27-2 at ¶¶ 64, 65). Markley inserted the Visine bottles in a film plastic cover from his pack of cigarettes and placed them on top of the car continuing to search the back seat behind the passenger seat. (Docket No. 27 at ¶ 25; Docket No. 27-2 at ¶ 65).[3]

Thereafter, Gomez asserts that Markley approached his car, and ordered Gomez to step out a second time. (Docket No. 27 at ¶ 15). At this point, Gomez claims Markley handed him a written consent to search form and asked him to sign the form if he disputed having illegal drugs in his car. *Id.*

Markley alleges that as Gomez exited his car, he observed a marijuana seed on the driver's seat. (Docket No. 23 at ¶ 17). Hence, Markley escorted Gomez to the rear of his car and asked him if he had marijuana in it. *Id.* According to Markley, Gomez denied that he had any drugs in his car. *Id.* at ¶ 18. Markley responded that he had observed a marijuana seed in plain view on the driver's seat of Gomez's car. *Id.* at ¶ 19. Gomez states that Markley's statements regarding the marijuana are entirely false. (Docket No. 27 at ¶ 19). According to Gomez, Markley found no marijuana in his car, nor did he present any evidence to substantiate such a claim. (Docket No. 27 at ¶ 17).

---

[3]

However, the record is not clear whether these events occurred in connection with Markley's weapon search or inventory search.

Gomez adds that Markley claimed to have found illegal drugs in his car but would not show them to him, and further, that Markley at no point used the words "marijuana seed." *Id.*[4]

During the course of the above described events, Markley asserts that Gomez exhibited continued nervous behavior by placing his hands in his pockets, fidgeting and playing with his cell phone. (Docket No. 23 at ¶ 21). In response to Gomez's behavior, Markley states that he repeatedly instructed Gomez to remove his hands from his pockets. *Id.* at ¶ 22. Gomez explains that he acted in a nervous manner because he was unsure of what Markley was planning to do and was reaching for his cell phone in an attempt to call a friend from the neighborhood to come to the scene as a witness. (Docket No 27 at ¶ 22; Docket No. 27-2 at ¶ 47).

Markley contends that he called for backup from the McDonald Police Department (hereinafter "McDonald") because he was concerned for his safety based on (1) the fact that Gomez claimed that he was from three different places; (2) there were no inspection stickers on his vehicle; (3) his driver's license was suspended; (4) Markley observed a marijuana seed on the driver's seat of his vehicle; and (5) he exhibited signs of extreme nervousness, such as repeatedly placing his hands in his pockets. (Docket No. 23 at ¶ 27). A McDonald officer arrived a short time later. *Id.* at ¶ 28. Gomez identifies a second McDonald officer as Harold Purdy. Purdy watched Markley search Gomez's car. (Docket No. 27 at ¶ 28; Docket No. 27-2 at ¶¶ 75 and 78).

Markley advised Gomez that his car needed to be towed if he was unable to summon another driver because it could not be left in its present condition. According to Gomez, Markley stated that the car was being impounded because he found drugs in his car and because he was not allowed to

---

[4]

      Gomez maintains that the presence of a marijuana seed did not become an issue until it was alleged in Markley's motion to dismiss. (Docket No. 27 at ¶ 17).

drive the car anywhere. (Docket No. 27 at ¶ 30; Docket No. 27-2 at ¶ 84). Markley further advised Gomez that if he allowed him to leave his car on the street, and if the car was damaged or stolen, Markley would be held responsible. (Docket No. 23 at ¶ 29). Markley asserts that Gomez was unable to find anyone to retrieve his car. *Id.* at ¶ 30.

Given that no one was available to retrieve Gomez's car, Markley informed Gomez that his car was going to be towed. (Docket No. ¶ 23 at 31; Docket No 27 at ¶ 31). Because Gomez's car was going to be towed, Markley did an inventory of the vehicle pursuant to Midway's procedures. [5] (Docket No. 23 at ¶ 32). In the course of Markley's inventory search of Gomez's car, he claims he observed three bottles of Visine on the console. *Id.* at ¶ 35. In light of Markley's perception of Gomez as nervous and the marijuana seed on the driver's seat, the presence of Visine indicated marijuana usage to him. *Id.* Markley maintains that he found a trace amount of what he believed to be marijuana in the center console. *Id.* at ¶ 33. Gomez disputes Markley's version of the facts, arguing that Markley found two bottles of Visine which he identified as illegal drugs. (Docket No. 27-2 at ¶¶ 65,66). Gomez also asserts that the marijuana seed and the trace amount of marijuana in the console did not exist. He further argues that Markley searched his car without a warrant either hoping to find drugs or intending to plant them in his car. (Docket No. 27 at ¶ 33).

Gomez then argues that Defendant's Exhibit "B" is not Midway Borough's Policy and Procedure, rather, it belongs to the McDonald Police Department, whom Markley worked for while employed with Midway. (Docket No. 27 at ¶ 32). In support, Gomez proffers an Affidavit of Patrick Cooper, who is the constable for the Midway Borough Police. (Docket No. 28-2 at ¶ 2).

---

[5]

     *See* Midway Borough Police Department Motor Vehicle Towing and Inventory attached to Markley's Affidavit (Docket No. 23-2) as Exhibit "B."

Cooper states that on June 3, 1992, he was the Chief of Police for the Borough of Midway and was never made aware by the Mayor of Midway Borough or Midway Borough Council of an enacted Motor Vehicle Towing and Inventory (Policy & Procedure). Cooper claims that such a document did not exist based on his personal knowledge as Chief of Police. *Id.* at ¶ 4. Also, Cooper asserts that during his tenure as Chief of Police for the Borough of Midway, he had never seen or been made aware by the Mayor of Midway Borough or Midway Borough Council of an enacted "Vehicle Impound Record." *Id.* at ¶ 5.

After the vehicle inventory was completed, Markley arranged for it to be towed to Wally's Towing.[6] (Docket No. 23 at ¶ 34; Docket No. 27 at ¶ 34). Markley, in front of Purdy, then provided Gomez with another form, asking Gomez to sign it, stating that it was an inventory form to account for all the items present in his vehicle before it was towed. (Docket No. 27 at ¶ 30; Docket No. 27-2 at ¶ 85). Gomez signed the form. (Docket No. 27-2 at ¶ 86).

Gomez states that after the two hour search, Markley informed him that he would receive citations on all the counts he was being charged with by mail. (Docket No. 27 at ¶ 30; Docket No. 27-2 at ¶ 82). Subsequently, Markley issued the following citations to Gomez: 75 Pa.C.S.A. § 1543(a) (driving while license is suspended or revoked); 75 Pa.C.S.A § 1301 (driving an unregistered vehicle); and 75 Pa.C.S.A. § 4703 (operating vehicle without a valid inspection).[7] (Docket No. 23 at ¶ 35; Docket No. 27 at ¶ 35). Gomez was found guilty by the district justice of 75 Pa.C.S.A. § 1301 (driving an unregistered vehicle) and 75 Pa.C.S.A. § 4703 (operating vehicle

---

[6]

> *See*, Vehicle Impound Record attached to Markley's Affidavit (Docket No. 23-2) as Exhibit "C".

[7]

> *See*, Citations attached to Defendant's Affidavit (Docket No. 23-2) as Exhibit "D".

without a valid inspection) (Docket No. 23 at ¶ 36; Docket No. 27 at ¶ 36).  Gomez highlights the fact that he was also found not guilty of driving with a suspended driver's license.[8] (Docket No. 27 at ¶ 36).

## III.    PROCEDURAL HISTORY

On July 5, 2007, Gomez commenced this action, (Docket No. 5), to which Markley and Midway filed a Motion to Dismiss in the form of a Motion for Summary Judgment and Brief in Support.  (Docket No. 22 and 24).  Thereafter, Gomez filed a Brief in Opposition to Defendants' Motion.  (Docket No. 28).  On January 18, 2007, the Court heard oral argument and testimony as to Defendants' Motion.  (Docket No. 31).  During said hearing, Gomez made an oral motion requesting leave to file a cross motion for summary judgment and the Court granted said motion.  (Docket No. 31 and 32).  Subsequently, on January 22, 2008, Gomez filed his Motion for Summary Judgment (Docket No. 33).  In response, on March 7, 2008, Markley filed a Brief in Opposition.  (Docket No. 36).  By leave of Court, Gomez filed an Amended Cross Motion for Summary Judgment and Brief in Support on March 18, 2008.  (Docket No. 42 and 43).  On March 31, 2008, Markley filed a Response to said Amended Motion and a Brief in Opposition.  (Docket No.  45 and 46).  On April 21, 2008, this matter was fully briefed once Gomez filed his Sur-Reply Brief Opposing Defendants' Motion and Supporting Plaintiff's Motion.  (Docket No. 50).

---

[8]

Gomez's charge with respect to driving while his operating privileges were suspended or revoked was dropped and dismissed. (Docket No. 28-6 at ¶ 5).

## IV.    STANDARD OF REVIEW

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).

In evaluating the evidence, the Court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in their favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 249. "The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment." *Turner v. Leavitt*, Civil Action No. 05-942, 2008 WL 828033, at *4 (W.D. Pa. March 25, 2008) (citing *Horta v. Sullivan*, 4 F.3d 2, 8

(1st Cir. 1993) (citing 10 WRIGHT AND MILLER, FEDERAL PRACTICE § 2721 at 40 (2d ed.1983)));

*Pollack v. City of Newark,* 147 F. Supp. 35, 39 (D.N.J. 1956), *aff'd,* 248 F.2d 543 (3d Cir. 1957), *cert. denied,* 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

While the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the non-movant's burden of proof at trial.  *Celotex,* 477 U.S. at 322-323. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324.  The nonmoving party "cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir. 1989).

Further, Local Rule of Court 56.1.E describes the consequences of either party's failure to follow the rules set forth pertaining to submission of concise statements of material facts and responsive concise statements of material facts for summary judgment motions stating that "facts claimed to be undisputed 'will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." W.D. Pa. L. R. 56.1(E);  *Hickenbottom v. Nassan,* 2007 U.S. Dist. LEXIS 24336 (W.D. Pa. 2007).

Finally, the Court notes that Gomez is proceeding in this action *pro se.*  Accordingly, during the summary judgment stage, courts have recognized their obligation to construe *pro se* submissions

liberally. *Hodson v. Alpine Manor, Inc.* 512 F. Supp.2d 373 (W.D. Pa. 2007). In doing so, "the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein." *Hodson*, 512 F. Supp at 384.

## V.      DISCUSSION

Presently before the Court are cross- motions for summary judgment. As the same issues are argued in both motions, the Court will address said motions concurrently.

### A.      Gomez's Fourth Amendment Claim Against Midway Borough Police Department

#### 1.      Midway Borough Police Department is not a proper party

Gomez has named the Midway Borough Police Department as a defendant in this action. (Docket No. 5). To the extent that Gomez contends that the police department is a person for purposes of §1983 liability under *Monell v. Department of Social Services,* 436 U.S. 658 (1978), this Court disagrees. Indeed, it is firmly established that a municipal police department is not a proper party in a §1983 action. *Johnson v. City of Erie,* 834 F.Supp. 873 (W.D. Pa. 1993). *Johnson* holds that a municipal police department is not a proper party to a §1983 action because it is merely a sub-unit of the borough and is not a separate corporate entity. *Id.* at 878-89. Thus, Midway is not a proper party for a §1983 action. Nevertheless, given that this Court must construe Gomez's complaint liberally pursuant to *Hodson,* the Court will address whether or not Gomez has demonstrated a claim against Midway Borough for a Fourth Amendment violation by way of 42 U.S.C. § 1983.

## 2.    Lack of demonstrated municipal liability

Local governing bodies are deemed to be "persons" within the meaning of §1983 and can be sued directly under the act for monetary, declaratory, or injunctive relief. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). To establish municipal liability, a plaintiff must: 1) demonstrate the existence of an unlawful policy or custom, and 2) prove that the municipal practice was the proximate cause of his injury. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). A municipality is liable "where the municipality itself causes the constitutional violation at issue." *Canton v. Harris*, 489 U.S. 378, 385 (1989). To establish causation, plaintiff must allege a "plausible nexus" or "affirmative link" between the violation and the municipality's custom or practice. *Bielevicz*, 915 F.2d at 850. A municipality is not liable for the alleged misconduct of its employees absent a link or nexus between the custom or policy and the employee's misconduct because such liability would be predicated upon the doctrine of *respondeat superior*. *Monell*, 436 U.S. at 691.

In *Monell*, the Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983. *Monell*, 436 U.S. 658 (1978). In so ruling, the Court declared that municipal liability may not be premised on the mere fact that the governmental unit employed the offending official, *i.e.*, through application of the doctrine of *respondeat superior*. *Monell*, 436 U.S. at 694. Instead, the Court concluded that a governmental unit may be liable under § 1983 only when its "policy" or "custom," whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, directly inflicted the injury. *Monell*, 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which

12

the municipality is actually responsible, *i.e.*, acts that the municipality has officially sanctioned or ordered. *Id*.

In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), the Court further clarified that "municipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. at 483 (citation omitted).The Supreme Court has instructed that a "policy" is made when a decision maker possessing final authority over the subject matter issues an official proclamation, policy, or edict. *Pembaur*, 475 U.S. at 481. Custom can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as to virtually constitute law. *Monell*, 436 U.S. at 690; *See also Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

Mere identification of a policy or custom is not enough to establish municipal liability; a plaintiff also must establish causation. In this regard, a plaintiff carries the burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation at issue. *See Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997) (a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights).

In the case at bar, Gomez merely points to a policy: the Motor Vehicle Towing & Inventory policy used by the police department. However, Gomez has not set forth sufficient evidence to prove that any actions taken by Markley demonstrate an *unlawful* custom or practice attributable to Midway Borough. *See Bielevicz*, 915 F.2d at 850. In other words, Gomez has not identified any

policy or custom attributable to Midway Borough which resulted in a constitutional deprivation of his rights. Furthermore, Gomez's *Monell* claim fails as to causation, i.e., he has not demonstrated a "plausible nexus" between Midway Borough and his alleged constitutional deprivation. Accordingly, Plaintiff's Fourth Amendment claim against Midway Borough Police Department (construed *very* liberally as against Midway Borough) fails and the Court will grant summary judgment as to said claim.

### B. Gomez's State Law Claims Against Midway Borough Police Department

Midway also asserts that Gomez's state law claims for defamation and invasion of privacy (false light) against Midway are barred by governmental immunity. (Docket No. 24 at 2). The Court agrees. Under the Pennsylvania Political Subdivision Tort Claims Act ("Act"), 42 Pa. C.S. § 8541, Midway is considered a local governmental agency entitled to governmental immunity. The Act provides that, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S. § 8541. Thus, local agencies, such as Midway, are immune from liability. If a plaintiff can prove a negligence claim for damages that falls within one of the eight exceptions to §8541, governmental immunity can be pierced.[9] 42 Pa. C.S. §8542(b). However, none of the eight exceptions are applicable to Gomez's case. Therefore, Gomez's claims of defamation and invasion of privacy (false light) against Midway Borough are dismissed, with prejudice. *See Smith v. School Dist. of Philadelphia,* 112 F.Supp.2d 417, 424 (E.D. Pa. 2000) (plaintiff's state law claims of

---

[9]
The following eight exceptions to 42 Pa. C.S. § 8541 are categories which contain acts that when performed by a local agency or any of its employees, may result in the imposition of liability on a local agency: (1) vehicle liability, (2) the care, custody or control of personal property, (3) real property, (4) trees, traffic control, and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, and (8) the care, custody or control of animals. *See* 43 Pa. C.S. §8542(b).

defamation and invasion of privacy against two municipal entities were barred under Pennsylvania law).

### C. Gomez's Fourth Amendment Claims Against Markley

Gomez asserts that Markley violated his Fourth Amendment rights by allegedly performing an illegal search and seizure of his vehicle during a traffic stop. (Docket No. 5 at 1). Markley concedes that there was a search and seizure of Gomez's vehicle during said traffic stop. (Docket No. 23 at ¶ 32). He also maintains that such search and seizure was legally instituted because Gomez's vehicle bore no inspection stickers, Gomez advised Markley that the vehicle was not registered, and Gomez's driver's license was suspended. (Docket No. 24 at 1). Hence, as Gomez was ineligible to drive his vehicle from the scene of the traffic stop, and his vehicle could not be lawfully driven pursuant to the Motor Vehicle Code, Markley contends he properly performed an inventory search prior to having Gomez's vehicle towed. *Id.*

The Court finds that this case presents three different vehicle searches: (1) Gomez was removed from his vehicle during the traffic stop and allegedly Markley searched the area immediately around Gomez's driver seat before allowing Gomez to get back into his vehicle (Docket No. 27-2 at ¶ 31); (2) Markley searched Gomez's vehicle for contraband (Docket No. Docket No. 27 at ¶ 25; Docket No. 27-2 at ¶¶ 64, 65); and (3) Gomez's car was later searched again and towed from the area of the traffic stop. (Docket No. 27-2 at ¶82, 89). In this Court's estimation, the first search of Gomez's vehicle amounted to a *Terry* search for weapons, the second search (to the extent that it happened) amounted to a search for contraband, and the third search amounted to an inventory search of Gomez's vehicle.

Construing Gomez's allegations liberally, as the Court is required to do pursuant to *Hodson*, the Court finds that Gomez has not challenged the initial search of his vehicle for weapons, but rather bases his alleged Fourth Amendment violation on the second and third searches performed on his vehicle. Nevertheless, for the reasons set forth below, the Court finds that all the searches were reasonable and therefore valid under the circumstances in this case.

The First Search: Markley's weapons search

Markley asserts that, assuming he conducted a weapons search of Gomez's vehicle, said search was lawful under the circumstances in this case. (Docket No. 36 at 5). The following facts are pertinent. Gomez asserts that Markley abruptly ordered him to exit his vehicle and to place his hands on top of his vehicle. (Docket No. 27-2 at ¶ 27). Gomez complied with these instructions. Then Markley stated that he was going to search Gomez's person for weapons. *Id*. at ¶¶ 29, 31. Markley proceeded to search Gomez's person from top to bottom. Markley also inquired of Gomez whether he had anything on him or in his vehicle that he would want to voluntarily disclose before Markley commenced a search of his vehicle. *Id*. at ¶ 31. Following this search, Markley permitted Gomez to return to his car and sit in it. *Id*. at ¶35.

Markley's affidavit and response to Gomez's affidavit fails to address whether this search occurred. Markley explained by way of his testimony during a hearing on the motions before this Court that he did not recall conducting an area search in the vicinity of Gomez's driver's seat of the vehicle until he read Gomez's Brief, and that he may have conducted such a search to ensure that there were no weapons in the car before allowing Gomez to return to his vehicle. Specifically, Markley testified:

Court: Was his car ever searched to your knowledge?

16

> Witness:     Not that I can clearly remember.  Before his vehicle
>              was towed, there was an inventory search done on it
>              pursuant to the inventory policy my Sergeant-in
>              Charge mentioned earlier
>
> Court:  And who did the inventory?
>
> Witness:     I did the inventory.   Your Honor, if I may say
>              something now? The defendant–or–I am sorry–the
>              plaintiff provided the deposition where he mentioned
>              I had him out of the car twice.   I can't clearly
>              remember that.  That may have happened.  If that be
>              the case, before I put him back in that car, within the
>              area of the driver's seat would have been searched for
>              weapons.

(*Transcript of Hearing* on January 18, 2008 (hereinafter, "TR-1") at 39:11-25).

For the purposes of this motion, the Court will assume that the above facts occurred so that the first time Markley asked Gomez to get out of his car, he searched the area around Gomez's driver's seat for weapons, then asked Gomez to get back into his car.[10]  As stated above, the Court construes these facts as constituting a weapons search of Gomez's vehicle.

In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court held that an officer may approach a person and conduct a protective search for weapons, even without probable cause for arrest, when the officer has a reasonable suspicion that the person is armed and dangerous.  *Terry*, 392 U.S. at 24.  Reasonable suspicion requires a less demanding standard than probable cause. *Alabama v. White,* 496 U.S. 325, 330 (1990).  The Supreme Court authorized this lesser standard because an officer must be able to take reasonable steps to ensure his own safety when he faces imminent danger.  *Terry,* 392 U.S. at 23.  In addition, an officer should not have to ignore potentially

---

[10]     It does not appear that Gomez is asserting that the search of his person was illegal, rather only the search of his vehicle.

criminal behavior simply because there is no probable cause to arrest. *United States v. Maestas,* 941 F.2d 273, 276 (5th Cir. 1991).

In *Pennsylvania v. Mimms,* 434 U.S. 101, 111 n.6 (1977), the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." The Court justified this practice for the same reason provided in *Terry:* the safety of the officer. *Id.* at 110. The Court stated that the intrusion upon the driver is minimal and nothing more than a mere inconvenience, which "cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.* at 111.

In *Michigan v. Long*, 463 U.S. 1032 (1983), the Supreme Court extended the *Terry* and *Mimms* principles to vehicle searches. Specifically, the Supreme Court held that:

> [O]ur past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Long*, 463 U.S. at 1049 (quoting *Terry,* 392 U.S. at 21). As stated in *Terry,* the reasonable suspicion standard for a protective weapons search, whether on a person or in a limited area of his car, is lower than the standard for probable cause to arrest. *See generally Terry,* 392 U.S. 1; *Long,* 463 U.S. 1032. Courts have stated many reasons for upholding the reasonable suspicion standard, including

the minimally intrusive nature of a weapons search, the "inherent danger" of traffic stops, and the lowered expectation of privacy in one's automobile as compared to in one's home. *United States v. Shranklen*, 315 F.3d 959, 962 (8th Cir. 2003); *United States v. Menard*, 95 F.3d 9,11 (8th Cir. 1996); *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976).

The Court finds that Markley has articulated specific facts which, taken together with rational inferences from those facts, reasonably warrant Markley's belief that Gomez could have been armed and dangerous, thus justifying a limited *Terry* search for weapons in the area around Gomez's driver seat. Specifically, Markley knew that Gomez was operating an unregistered vehicle that also lacked inspection stickers. Markley reasonably believed that Gomez's license was suspended. *United States v. Coplin,* 463 F.3d 96, 100-01 (1st Cir. 2006) (if an officer reasonably believes that an individual's license is suspended, the fact that the license later turns out to be valid does not invalidate the reasonable suspicion). *United States v. Coley,* 974 F. Supp. 41, 44 (D.D.C. 1997) (driving an unregistered vehicle more than justifies the initial investigatory stop, but without more evidence of a dangerous criminal offense such as drugs or weapons, an officer cannot reasonably fear for his safety); Without a valid license, Gomez could not lawfully remove his own vehicle from the scene. (Docket No. 24 at 7); *See United States v. Davis,* No. 04-1883, 2004 WL 2677154, at **3 (3d Cir. Nov. 24, 2004)[11]. Markley also observed certain characteristics about Gomez, including signs of nervousness, furtive hand movements, and blood shot eyes. *United States v. Givan,* 320 F.3d 452, 459 (3d Cir. 2003) (the court lists nervous behavior as one of the factors that justified the officer's reasonable suspicion); *Davis,* 2004 WL 2677154, at **1-2 (bloodshot eyes was considered a factor

---

[11]

The Court notes the non-precedential status of said case and that it is not binding on this Court, yet cites *Davis* for its striking factual similarities.

in the totality of circumstances that justified reasonable suspicion). Finally, Markley reasonably believed that he saw a marijuana seed on the driver's seat. (Docket No. 24 at 7); *Davis,* 2004 WL 2677154, at **2 (one of the factors used to support reasonable suspicion is that the officer thought that he saw a marijuana stem in the car; even though it later turned out to be grass, the court still justified its consideration).

Most courts hesitate to set a "bright-line standard" for reasonable suspicion because each case must be decided on its own facts. *United States v. Roggeman,* 279 F.3d 573, 578 (8th 2002); *Ornelas v. United States,* 517 U.S. 690, 696 (1996); *United States v. Cortez,* 449 U.S. 411, 417 (1981). However, similar factors often resurface throughout case law, including those present in this case. *United States v. Hunt,* 253 F.3d 227, 231-32 (5th Cir. 2001) (while the court in this case held that the facts did not support reasonable suspicion to search for weapons or contraband, it did list the general factors that are often considered); *United States v. Edwards,* 53 F.3d 616, 618 (3d Cir. 1995) (the Third Circuit offered a slightly less stringent standard than other circuits by using a nonviolent crime, such as credit card fraud, as a basis for reasonable suspicion because of its *potential* to escalate to violence). Not only do the facts support Markley's reasonable suspicion to perform a limited weapons search, but the Court notes that the facts also support probable cause to arrest (see probable cause section *infra*). Therefore, it follows logically that Markley was justified when he performed a limited weapons search surrounding the driver's seat in order to ensure his own safety.

### 2. The Second Search: Markley's search for contraband

In between the *Terry* search and the inventory search, Gomez avers that Markley ordered him to stand about three (3) feet away from his vehicle, and Markley walked around the car to the front passenger's side door, opened the door and thoroughly searched his glove compartment and

removed two bottles of Visine. (Docket No. 27 at ¶ 25; Docket No. 27-2 at ¶¶ 64, 65). Markley then

inserted the Visine bottles in a film plastic cover from his pack of cigarettes and placed them on top

of the car continuing to search the back seat behind the passenger's seat. (Docket No. 27 at ¶ 25;

Docket No. 27-2 at ¶ 65). On the other hand, Midway contends that said search was later performed

as part of the inventory search. (Docket No. 23 at ¶ 33-35). Nevertheless, construing Gomez's

allegations liberally, to the extent said search for contraband occurred at this point, the Court finds

it was supported by probable cause.

The concept of probable cause is well settled:

> The test for probable cause in this circumstance is whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 232, 238, 103 S.Ct. 2317 (1983). Determinations of probable cause are based on a review of the "totality of the circumstances," and involve a practical, common sense review of the facts available to the officers at the time of the search. *See id .* at 230. "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts" and must be evaluated in light of the totality of the circumstances. *Id.* at 232. The test for probable cause is an objective test, based on "the facts available to the officers at the moment of arrest." *Barna v. City of Perth Amboy,* 42 F.3d 809, 819 (3d Cir.1994) (quoting *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223 (1964)). An officer may draw inferences based on experience to determine if probable cause exists. *See United States v. Ornelas,* 517 U.S. 690, 700, 116 S.Ct. 1657 (1996). Probable cause exists where the facts and circumstances within an arresting officer's knowledge are sufficient to warrant a reasonable police officer to believe an offense has been committed. *See United States v. McGlory,* 968 F.2d 309, 342 (3d Cir.1992), *cert. denied,* 506 U.S. 956 (1992); *United States v. Cruz,* 910 F.2d 1072, 1076 (3d Cir.1990), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 709 (1991). The "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying motivation. *See Graham v. Conner,* 490 U.S. 386, 397, 109 S.Ct. 1865 (1989).

*Parker v. Wilson*, Civ. No. 98-3531, 2000 WL 709484, at *5 (E.D. Pa. 2000).  Considering the totality of the circumstances, the following facts were known to Markley at the time of the alleged second search.  Gomez was driving an unregistered vehicle without inspection stickers, and he was driving with a suspended license.  *See Davis*, 2004 WL 2677154, at **1-3 (when supporting the totality of the circumstances approach to searching vehicles, the court listed a variety of pertinent factors, including the apparent presence of marijuana stems and the lack of inspection stickers; the court further stated that, even without any of the other factors, the car was still subject to a search because the defendant's "driver's license was suspended and he could not have legally driven the car away"); *see also Shabazz v. Nagy*, 2003 WL 22183493, at **2 (3d Cir. 2003) (lack of proper tags and reliable information that the vehicle may have been stolen was sufficient probable cause for arrest).  Gomez provided conflicting information about where he was from and/or where he lived. *See Givan,* 320 F.3d at 459 (court justified officer's further investigation and request for consent to search the vehicle when the driver and passengers provided conflicting information about their travel plans); *see also United States v. Johnson,* 63 F.3d 242, 244, 247 (3d Cir. 1995) (driver and passengers were "unusually" and  "exceptionally" nervous and provided the officer with conflicting information about their destination; the court ruled that any evidence from the resulting search was admissible).  Gomez exhibited signs of extreme nervousness and kept placing his hands in his pockets.  *See Maryland v. Wilson*, 519 U.S. 408, 410-411, 413 (1997) (the driver's and passenger's extremely nervous behavior justified the officer's request to have them each exit the vehicle; evidence that fell out of the car during their exit from the car was admissible because the initial request was justified); *see also Givan*, 320 F.3d at 458-59 (nervous behavior was one of the factors that an officer could use in a totality of the circumstances test).  Finally, Gomez had bloodshot eyes.

*See United States v. Veatch*, 596 F. Supp. 1327, 1330, 1331-32 (W.D. Pa. 1984) (bloodshot eyes was one of the reasons that led to reasonable suspicion and eventually probable cause to arrest; even if the officer incorrectly concluded that the driver's eyes were bloodshot from unlawful drug use, it did not invalidate the arrest because the standard is a reasonable conclusion of probability based on the officer's experience, knowledge, and observation). Additionally, Markley observed what appeared to be a marijuana seed in plain view on the driver's seat of Gomez's car. (Docket No. 24 at 7).

Accordingly, based on the foregoing, the Court finds that Markley's actions were objectively reasonable in view of the facts available to him at the time of the search.

### 3. The Third Search: Markley's inventory search of Gomez's vehicle

"In order to establish a claim under the Fourth Amendment, a plaintiff must show that the actions of the defendant: (1) constituted a "search" or "seizure" within the meaning of the Fourth Amendment, and (2) were "unreasonable" in light of the surrounding circumstances." *Parker,* 2000 U.S. Dist. LEXIS 7362, *8 (E.D. Pa. 2000). A vehicle must have lawfully come into police custody before a warrantless vehicle inventory search may be conducted. *United States v. Baily*, 223 Fed. Appx. 157, 161 (3d Cir. 2007) (citing *United States v. Frank*, 864 F.2d 992, 1001 (3d Cir. 1988). "An inventory search conducted by the police before the vehicle is towed is lawful if the police have grounds for impounding or otherwise taking custody of the vehicle, and the search is conducted pursuant to standard police procedures aimed at protecting the owners's property and protecting the police from the owner's later accusation of theft, loss or damage." *U.S. v. Morris*, Civ. No. 05-1750, 2006 WL 1222342 at *1 (3d Cir. May 5, 2006) (citing *Illinois v. Lafayette*, 462 U.S. 640, 643-44 (1983)).

Markley admits that he conducted an inventory search of Gomez's vehicle. (Docket No. 23 at ¶32). Hence, the Court must decide whether said inventory search was reasonable and valid.

First, it is undisputed that Gomez's vehicle bore no inspection stickers. (Docket No. 23 at ¶27). Accordingly, the investigative traffic stop in this case was lawful and reasonable as driving a vehicle with no inspection stickers is a violation of state law. *See* 75 Pa. C.S.A. § 3501(a); See also *United States v. Ryan*, 128 F. Supp. 2d 232, 236 (E.D. Pa. 2000) (because the Officer stopped the vehicle upon personal observation of a traffic violation (the expired certificate of inspection, in violation of 75 Pa. C.S.A. § 4703(a)), the automobile stop complies with the Fourth Amendment)).

Second, Markley had sufficient grounds for towing Gomez's vehicle as his vehicle had no inspection stickers and the registration was expired, thus, the vehicle could not be lawfully driven from the scene of the traffic stop. *See* 75 Pa. C.S.A. § 1301(a); *see also Frederick v. Hanna*, No. Civ. 05-514, 2006 WL 3489745, at *6 (W.D. Pa. Dec. 1, 2006). Additionally, even if the vehicle could be lawfully driven, Markley had no choice but to have the vehicle towed, because according to information Markley had at the time of their encounter, Gomez's driver's license was suspended and Gomez was unable to contact another person to lawfully drive his vehicle from the scene.[12] (Docket No. 23 at ¶29-31).

Because this Court finds that Markley had sufficient grounds for taking custody of the vehicle, i.e. towing the vehicle, the only issue that needs to be examined is whether Markley properly performed an inventory search of Gomez's vehicle under the circumstances. Such search must be conducted in accordance with "standard police procedures aimed at protecting the owners's property

---

[12] The Court notes that it is not relevant that said information concerning the status of Gomez's driving privileges later proved erroneous. *See Coplin*, 463 F.3d at 100-01.

and protecting the police from the owner's later accusation of theft, loss or damage." *Morris*, 2006

WL 1222342, at *1.

The Midway Borough Police Department's Motor Vehicle Towing and Inventory Policy

states that:

> when authorized to remove vehicles, officers will remove such
> vehicles to a place of safety in order to ensure the security of the
> vehicle and the safe and efficient flow of traffic. This policy is
> designed to protect the owner's property, protect officers against
> claims of lost/stolen items, protect from dangerously concealed items,
> and protect the public from hazardous roadway obstructions.
> ...
> All vehicles removed by officers, regardless of reason, will be
> inventoried, and the record kept as part of the incident.

(Docket No. 23-2).

Although Gomez may have initially created an issue of fact surrounding whether the Midway

Borough Police Department had a towing and inventory policy in place at the time of the events, said

issue was resolved during the hearing on the motions. (Docket No. 27 at ¶32). Specifically, Officer

Vanatta, the officer in charge of the Police Department during the pertinent time period, testified

that he enacted Midway's Motor Vehicle Towing and Inventory policy and procedure (See Docket

No. 23-2), which was in place during the relevant incident. (TR-1 at 7: 16-25- 9: 1-13). Officer

Vanatta also testified that he spoke with Markley during the traffic stop in this case; and Markley

requested instruction on "what to do since the operator of the vehicle did not have a driver's license,

no inspection, and I believe the registration was expired on the vehicle, and he wanted to know if

he would be able to tow the vehicle." (TR-1 at 10:23- 11:2). In response, Officer Vanatta advised

Markley that he could tow the vehicle and reminded him that Midway had an inventory policy and

procedure in an effort to ensure that Markley inventoried the contents of the vehicle before it was

towed from the scene. (TR-1 at 11:5-8). Officer Vanatta also confirmed that the purpose of said inventory was to protect the owner of the vehicle, as well as the officer, in case there were any valuables in the vehicle. (TR-1 at 11:11-15). Further, Gomez admits to reading and signing the inventory form after the search was performed, indicating that Markley properly performed and accounted for Gomez's property in the vehicle. (Docket No. 27-2 at ¶¶ 85-86).

Considering the above evidence, the Court finds that there are no facts supporting Gomez's claim that Markley violated his Fourth Amendment rights by performing an inventory search on Plaintiff's vehicle and then seizing and/or towing his vehicle. Accordingly, the Court dismisses said claim with prejudice.

### C.     Gomez's Racial Discrimination Claim

To the extent that Gomez's complaint can be construed to raise a claim of race discrimination, said claim is dismissed as Gomez conceded that he is no longer pursuing said claim. Specifically, Gomez testified during the January 18, 2008 hearing that "...I will forfeit the claim that I brought that he racially discriminated against me." (TR-1 at 92:17-18). Accordingly, construing Gomez's allegations liberally, to the extent he sought a race discrimination claim against Midway and Markley, the Court dismisses said claims, with prejudice.

### D.     Gomez's State Law Claims Against Markley

The Court reads Gomez's allegations to assert the following Pennsylvania state law claims: defamation, invasion of privacy (false light), and intentional infliction of emotional distress. (Docket No. 5).

### 1.     Gomez's defamation claims against Markley

Under Pennsylvania law, a plaintiff in a defamation action has the burden of proving: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. C.S.A. § 8343. "The defendant can defend against an action in defamation by proving that the defamatory communication was true, the occasion on which it was published was of privileged character, or that the character of the subject matter of the defamatory comment was a public concern." *Spain v. Vicente*, 461 A.2d 833, 836 (Pa. Super 1983) (citing 42 Pa. C.S.A § 8343(b)).

At oral argument, the Court asked Gomez to clarify the basis of his defamation claims and he provided several instances that he maintains form the foundation of his defamation claims.

First, Gomez alleges that Markley used vulgar language with Gomez, called him names, and associated him with a murder that happened in Gomez's neighborhood. (TR-1 at 67: 13-18). Second, Gomez states that the stepfather to his children called him a loser, a failure, and told him that his house was being watched for drugs. *Id.* at 69:18-24.

In a claim for defamation, the *Restatement (Second) of Torts*, §577, comment b, explains, "to constitute a publication it is necessary that the defamatory matter be communicated to some one other than the person defamed. The courts in Pennsylvania have adopted §577 of the Restatement. *See Foxworth ex rel. Collins v. Chichester School Dist.,* 35 F.Supp.2d 446, 448 (E.D. Pa. 1999). The law of defamation primarily protects only the interest in reputation. Therefore, unless the defamatory matter is communicated to a third person there has been no loss of reputation." There is no evidence in the record that Markley's alleged vulgar language, name-calling, or association

of Gomez with a murder were communicated to a third party. There is also no evidence that the remarks of his children's stepfather to Gomez were published to a third party. Hence, this Court finds that Gomez has failed to make out a prima facie case for defamation based on the statements described above.

Third, Gomez alleges that after the state court proceeding on Gomez's charges for violation of the Motor Vehicle Code, Markley approached Gomez's attorney, Cary Jones. According to Gomez, Markley informed Ms. Jones that he had found drugs in Gomez's vehicle. (Docket No. 28-6 at ¶ 6-7). Fourth, during this case, when Defendants filed their motion to dismiss against Gomez, they asserted that there was a pending criminal case against him. (TR-1 at 69:25-70:1-9).

"It has long been the law of Pennsylvania that statements made by judges, attorneys, witnesses and parties in the course of or pertinent to any stage of judicial proceedings are absolutely privileged and, therefore, cannot form the basis for liability for defamation." *Pawlowski v. Smorto,* 588 A.2d 36 at 41 (Pa. Super.1991). Statements include those made in pleadings, open court, or even in less formal circumstances, such as preliminary conferences, negotiations, and routine correspondence exchanges between counsel in furtherance of their clients' interests. *Pelagatti v. Cohen,* 536 A.2d 1337 at 1334 (Pa. Super. 1987). Markley is not only a party, but he is also a witness to this case and a witness in the underlying vehicle code violation hearing. His statements were made in a courtroom to Gomez's attorney and are pertinent to Gomez's pending case. Also, Defendant's statement regarding a pending criminal case against Gomez was made in the course of and is pertinent to Gomez's current judicial proceeding. Accordingly, the above statements are afforded judicial privilege and cannot form the basis for a defamation claim.

The purported instances of defamation that Gomez elucidated for the Court do not survive summary judgment. Thus, for the foregoing reasons, Gomez's defamation claims against Markley are dismissed with prejudice.

## 2. Gomez's invasion of privacy claim against Markley

Construing Gomez's complaint liberally, Gomez states a cause of action for invasion of privacy (false light). In support of said false light claim, he highlights the same facts as used to establish his defamation claims. *See* supra at § V(D)(1) at 23. Markley asserts that Gomez's claim for invasion of privacy (false light) fails as "no averment or evidence exists to establish that the incident that occurred on March 26, 2007 was given publicity in the essence that it was widely disseminated publicly." (Docket No. 24 at 10). Thus, Plaintiff's claim must be dismissed. *Id*. The Court agrees.

The *Restatement (Second) of Torts* describes "Publicity Placing Person in False Light" as:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

§ 652E (1965). This definition has been adopted by the Pennsylvania courts. *Vogel v. W.T. Grant Co.*, 327 A.2d 133, 136 (Pa. 1974). "The 'false light' tort differs from a claim of defamation in at least two respects: publicity (i.e. widespread dissemination) is required, rather than mere publication; and the false statement or imputation need not be defamatory." *Weinstein v. Bullick*,

827 F. Supp 1193, 1202 (E.D. Pa 1993) (citing *Bromhall v. Rorvik*, 478 F. Supp. 361, 367 (E.D. Pa. 1979; *Restatement (Second) of Torts* § 652E *(1965)*, Comments a & b, § 652D, Comment a)).

Here, this is no evidence in the record that the facts and/or statements Gomez relies on in support of his alleged invasion of privacy (false light) claim were widely disseminated, let alone merely published. Thus, Gomez has failed to set forth a prima facie case for his invasion of privacy (false light) claim. Accordingly, summary judgment is granted with respect to this claim and said claim is dismissed, with prejudice.

### 3. Gomez's claims for intentional and/or negligent infliction of emotional distress

The Court also reads Gomez's complaint as asserting a claim for intentional infliction of emotional distress ("IIED"). There are four elements that a plaintiff must establish in order to set forth a cause of action for IIED: (1) the conduct of the defendant must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) defendant's conduct must cause emotional distress; (4) the distress must be severe. *Restatement (Second) of Torts* § 46 (1965). Pennsylvania courts have adopted § 46 of the Restatement. *See Hill v. City of Philadelphia,* 2008 WL 2622907 at 9 (E.D. Pa. 2008). Further, in order to state an IIED claim under Pennsylvania law, a plaintiff must establish physical injury or harm. *Johnson v. Caparelli*, 625 A.2d 668, 671 (Pa. Super. Ct. 1993). In addition, in *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 955 (Pa. 1987), the Pennsylvania Supreme Court, held that "at the very least, existence of the alleged emotional distress must be supported by competent medical evidence." *See also Jackson v. Paparo,* 2002 WL 32341800 (E.D. Pa.).

In this case, Gomez has failed to present sufficient evidence to establish physical harm and severe emotional distress in support of his claim for IIED. Further, Gomez has not come forth with any "competent medical evidence" to support his claim for IIED. To the extent Gomez's complaint alleges a claim for intentional infliction of emotional distress, said claim is dismissed, with prejudice.

### E.      Gomez's Claim for Punitive Damages

Defendants have also moved for summary judgment on Gomez's claim for punitive damages under §1983. As the Court has dismissed all of Gomez's claims finding that said claims cannot survive past summary judgment, the issue of punitive damages is moot. Nevertheless, punitive damages claims are barred against municipalities under §1983. *City of Newport v. Fact Concerts Inc.,* 453 U.S. 247, 271 (1981). Furthermore, punitive damages sought by a plaintiff against an individual defendant in his official capacity are likewise barred.[13] *See Mitros v. Borough of Glenolden,* 170 F.Supp.2d 504, 508 (E.D. Pa. 2001). Therefore, Gomez's punitive damages claims against Markley, in his official capacity, and against Midway Borough are dismissed, with prejudice.

### V.      CONCLUSION

Based on the foregoing, the Court finds that Gomez has not presented sufficient evidence for a jury to return a verdict in his favor. Therefore, for the reasons set forth above, the Court GRANTS Defendants' Motion to Dismiss in the form of a Motion for Summary Judgment (Docket No. 22) and DENIES Gomez's Amended Cross Motion for Summary Judgment (Docket No. 42).

---

[13]      There is no evidence of record and there has been no argument that Markley acted in anything but his official capacity.

Accordingly, all claims against Defendants are dismissed, with prejudice. An appropriate order follows.

*/s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: July 18, 2008

CC:    All counsel of record
        John Paul Gomez (via regular mail)